IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 9, 2009 Session

# KNOX COUNTY, TENNESSEE, on the relationship of ENVIRONMENTAL TERMITE & PEST CONTROL, INC., *qui tam*

**Direct Appeal from the Chancery Court for Knox County**
**No. 158430-2      Hon. Daryl Fansler, Chancellor**

**No. E2007-02827-COA-R3-CV  - FILED JULY 20, 2009**

Plaintiff filed this action as a "*qui tam* claim" pursuant to the Tennessee False Claims Act. Tenn. Code Ann. § 4-18-101 *et seq.* The Trial Court awarded plaintiff proceeds from the settlement under the Act and both parties have appealed. On appeal we hold that plaintiff did qualify under the statute as an original source, and the Trial Court had jurisdiction to award a recovery. However, we hold there is not sufficient evidence to affirm the award. We vacate the award and remand pursuant to Tenn. Code Ann. § 27-3-128.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part and Remanded.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J., and NORMA MCGEE OGLE, J., joined.

David S. Wigler, Knoxville, Tennessee, for appellant.

John E. Owings, Knox County Law Director and Robert C. McConkey, Deputy Law Director, Knoxville, Tennessee, for appellee.

## OPINION

Plaintiff/Appellant, Environmental Termite and Pest Control, Inc., brought this action in Chancery Court on behalf of Knox County against defendant Allied Lawn Services (Allied) and Arrow Exterminators, Inc., (Arrow) under the Tennessee False Claims Act. Tenn. Code Ann. § 4-18-101 *et seq.* (TFCA). (This action will be referred to as the "*qui tam* suit or claim").

The TFCA provides that a private person may bring an action on behalf of a political subdivision and that such action must initially be filed under seal. A private person who brings such an action under the FCA is referred to as the *qui tam* plaintiff. Tenn. Code Ann. § 4-18-104(c)(1) and (2). The complaint alleged that defendant Arrow was the successful bidder for a termite treatment service contract with the Knox County School System in 1996. Environmental was the successful bidder for a pest control contract in 1999. In 2000 defendant Allied was the successful bidder for the termite contract with the school system. In 2001 the termite contract was again re-bid. Environmental prepared to bid on the contract in 2000 and during its preparation it discovered that Arrow had billed Knox County more than the contract price of $2.90 per actual lineal foot by increasing the actual lineal footage of the schools treated by, in some cases, as much as two to three times the actual lineal footage of the school. Environmental alleged that as it had continued its investigation it became apparent that Allied, who was awarded the contract in 2000, continued the false billing practices of Arrow by increasing the lineal footage of the schools at issue. The complaint alleged that pursuant to these fraudulent billing practices Knox County had paid in excess of $400,000.00 for the services of Arrow and Allied.

According to the complaint, Environmental brought its allegations of false claims to the attention of the Knox County Law Director in February 2001 and additionally hired an attorney and investigator to "force" the Law Director to take action. Environmental claimed in the complaint that from 2001 until the complaint was filed in June, 2003 the Law Director failed to take any action regarding the allegation of false claims and that the Director permitted Allied to continue to provide services to the County and that Allied continued to fraudulently bill the County for its services. The complaint additionally alleged that the Law Director had recently made representations that it intended to settle with Allied and Arrow for amounts "far less than those persons owe" Knox County. Environmental also alleged that defendants worked in concert with "officers or employees" of Knox County to carry out the fraudulent billing scheme.

Ten days after Environmental filed its complaint in Chancery Court, Knox County filed a complaint in the Circuit Court against Arrow and Allied "to recover damages for breach of contract, for money wrongfully had and received and for conversion". The Knox County suit did not make any allegations pursuant to TFCA. The complaint alleged that Arrow used termite control/treatment methods other than that provided by the contract, had billed the County for those treatment methods, had inflated the linear feet service or inflated the linear feet prices between November 1996 and September 2000, and that Arrow's actions were purportedly discovered by the County in February 2001.

On July 3, 2003 Knox County made a special appearance in the *qui tam* suit filed in Chancery Court by Environmental and moved for dismissal or, alternatively, disqualification of Environmental's counsel. On August 1, 2003 Knox County filed notice of its election to intervene in the *qui tam* suit pursuant to Tenn. Code Ann. § 4-18-104(c)(7)(D) and as a result the Knox County suit was transferred from the Circuit Court to the Chancery Court for consolidation for trial with the *qui tam* suit by an Agreed Order.

-2-

According to the testimony of Environmental's lawyer, the parties participated in a judicial settlement conference on November 10, 2005. At the conference, Knox County and Environmental reached a joint settlement with Allied which included Environmental's *qui tam* claims for a share of the settlement under Tenn. Code Ann. §§ 4-18-104(g)(2) and (8). A settlement with Arrow did not take place on November 10, 2005. However, on December 27, 2005, Knox County and Arrow filed a joint motion to continue the trial, based on their having reached an agreement in principle to settle the County's claims against Arrow upon terms that Arrow would provide goods and services to the Knox County schools and the Trial Court granted the continuance. In April 2006 Knox County and Arrow entered into a written settlement agreement in which Arrow agreed to install Sentricon Termite Colony Elimination Systems in certain Knox County schools and to provide monitoring and services associated with the systems for one year. Environmental was not a party to this settlement, and Knox County and Arrow represented to the Trial Court that the *qui tam* plaintiff had been presented with the settlement agreement and did not dispute that the terms of the settlement were fair, adequate and reasonable. However, Environmental objected to the settlement to the extent such objection may be necessary to preserve its interests under Tenn. Code Ann. §§ 4-18-104(g)(2) and (8). The settlement was approved by the Chancellor, with the provision that any and all issues concerning Environmental's rights and interests under Tenn. Code Ann. §§ 4-18-104(g)(2) and (8) were reserved for further determination by the Court. At a judicial settlement conference, Environmental and Arrow compromised the *qui tam* plaintiff's claims for attorney's fees and costs pursuant to Tenn. Code Ann. §§ 4-18-104(g)(8). On December 20, 2006 Environmental filed a motion for partial summary judgment as to the liability of Knox County to the *qui tam* plaintiff's claims for its share of the proceeds of the settlement pursuant to Tenn. Code Ann. §§ 4-18-104(g)(2). Knox County opposed the motion for partial summary judgment and contended that it had received no "proceeds" from the settlement within the meaning of the statute. Alternatively, if the Court determined that Environmental was entitled to recover from Knox County, the County urged the Court to place a value on the services it had received from Arrow in view of the particular facts and circumstances. A hearing was held on February 5, 2007, and the Court found that the installation of the Sentricon Termite Colony Elimination System at Knox County's facilities pursuant to the settlement agreement constituted "proceeds" of the settlement within the meaning of Tenn. Code Ann. §§ 4-18-104(g)(2), and that Environmental was entitled to recover a share of the value of those proceeds under that statute. The Court ordered an evidentiary hearing determine the value of the proceeds of the settlement.

Environmental filed a notice of compromise and dismissal of its claims against Arrow, which notice reflects that the *qui tam* plaintiff received $60,000.00 for attorney's fees from Arrow on February 1, 2007 pursuant to Tenn. Code Ann. §§ 4-18-104(g)(8). The notice also stated that Environmental's claims against Knox County were not affected by the compromise with Arrow.

Knox County and Environmental entered into the following stipulation regarding the value of the services Arrow provided to Knox County under the settlement agreement:

1. Pursuant to the Settlement Agreement approved by the Court in this case, Defendant Arrow Exterminators, Inc. installed a total of 194, 907 linear feet

of the Sentricon Colony Elimination System for the Knox County Schools.

2. In December of 2005, Knox County received the following price quotes from third-party vendors for the installation of Sentricon at Knox County Schools properties, and such quotes are reasonably representative of the market rates for such a project: (a) $2.50 per linear feet plus a coring cost of $30.00 per core, if necessary, for any concrete coring; and (b) $2.85 per linear foot without separate charges for concrete coring.

The stipulation contained a caveat that "Knox County does not agree that such cost is an appropriate measure of the value of the settlement for purpose of Tenn. Code Ann. § 4-18-104(g)(2)."

Following the evidentiary hearing, the Final Judgment entered on September 10, 2007 provided:

ORDERED, that all claims against Allied and Arrow are dismissed, with prejudice;

ORDERED, that the Court does have jurisdiction to hear the *qui tam* Plaintiff's claims against Knox County pursuant to T. C. A. § 4-18-104(g)(2);

ORDERED, that the *qui tam* Plaintiff shall recover from Knox County the sum of $71,546.46 pursuant to T. C. A. § 4-18-104(g)(2);

ORDERED, that costs are taxed ½ to Arrow and ½ to Allied through April 7, 2006 and all remaining costs are taxed to Arrow, for which execution may issue.

In its Judgment, the Trial Court found that 46% of the schools had been treated before the settlement, leaving only 54% of the schools to be treated after the settlement, and decided that the value of services Arrow delivered pursuant to the settlement was $255,523.07. The Court stated its finding as follows:

Therefore, giving the County every benefit as to whether or not it is receiving any value for the balance of the services, it appears, at the least, it is receiving services with a value to the [C]ounty of $255,523.07. Under §104(g)(2) of the Act, the *qui tam* plaintiff may share in at least 25% but not more than 33% of the proceeds of the action or settlement of the claim depending upon the extent to which the *qui tam* plaintiff substantially contributed to the prosecution of the action. The overwhelming proof in this case indicates that the over billing would never have been discovered without the *qui tam* plaintiff's pre-litigation investigation and report to the government. Indeed, it is highly likely that the practice would continue to the present resulting in additional losses to the County. Therefore, the Court is of the opinion that the *qui tam* plaintiff in this case shall receive $71,546.46 representing 28% of

-4-

$255,523.07.

Knox County took the position that the *qui tam* suit filed by Environmental was based on the audit conducted by the County and on various reports in the media and because the suit was based on these public disclosures the Court lacked jurisdiction pursuant to the FCA. The statute the County relied on is Tenn. Code Ann. § 4-18-104(d)(3)(A) and (B) which provides:

(A) No court shall have jurisdiction over an action under this chapter based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in an investigation, report, hearing, or audit conducted by or at the request of the general assembly, comptroller of the treasury, or governing body of a political subdivision, or by the news media, unless the action is brought by the attorney general and reporter or the prosecuting authority of a political subdivision or the person bringing the action is an original source of the information.

(B) For purposes of subdivision (d)(3)(A), "original source" means an individual, who has direct and independent knowledge of the information on which the allegations are based, who voluntarily provided the information to the state or political subdivision before filing an action based on that information, and whose information provided the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in subdivision (d)(3)(A).

The Trial Court relied on federal case law developed under the federal False Claims Act, 31 U.S.C. § 3729-3722 in interpreting these parts of the Tennessee False Claims Act because it was unable to locate any Tennessee cases interpreting the Tennessee Act. In this regard, the Trial Court concluded that the only way the *qui tam* suit could survive the County's jurisdictional challenge was for the *qui tam* plaintiff to establish that it was an "original source." The Trial Court examined several federal cases concerning the interpretation of "original source" and concluded that a relator who depends on public documents during its independent investigation that results in the discovery of a fraud can be an "original source" if the relator has ferreted out the fraud through effort and independent deduction. The Court concluded that this plaintiff was an original source, and in concluding that Howard and Environmental were an original source, stated the following:

The legislature has declared that the FCA is remedial in nature and is to be liberally construed to effectuate its purpose. Tenn. Code Ann. § 4-18-107(c). Under these circumstances one would be hard pressed to describe Mr. Howard as a "parasitic plaintiff". Indeed, the unrefuted testimony is that he had no idea that he could possibly benefit from pursuing the investigation into these fraudulent activities when he commenced his efforts in December 2000. In fact, there was no such method by which he could benefit at that time. Accordingly, the Court concludes that Mr. Howard is an original source taking into consideration all the factors set forth in the cases cited above.

The issues raised on appeal are:

I.     Whether the Trial Court erred in finding that the *qui tam* plaintiff was an "original source" and finding that the Court had subject matter jurisdiction over the *qui tam* claim?

II.    Whether the Trial Court erred in finding that the services received by Knox County under the settlement agreement were "proceeds of the settlement" subject to the *qui tam* plaintiff's claim for a statutory share of the proceeds of the action or settlement?

III.   Whether the Trial Court used an erroneous standard of proof in determining the value of the settlement between Knox County and Arrow?

IV.    Whether the evidence preponderates against the Trial Court's calculation of the value of the proceeds of the settlement?

V.     Whether the Trial Court erred when it assigned the *qui tam* plaintiff's statutory percentage as 28% of the settlement value?

The standard of review of a trial court's findings of fact is *de novo* with a presumption that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Issues of law are reviewed *de novo* with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn.1999). To the extent that the determination of the issues rests on statutory construction, they present questions of law. *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 924 (Tenn.1998). Mixed questions of law and fact are subject to a different standard of review. The standard of review of rulings on mixed questions of law and fact is *de novo* with a presumption of correctness extended only to the lower court's findings of fact. *In re Estate of Hutcherson,* No. M2007-02747-COA-R3-CV, 2008 WL 4767056 at * 3 (Tenn. Ct. App. Oct. 28, 2008)(citing *Abdur' Rahman v. Bredesen,* 181 S.W.3d 292, 305 (Tenn. 2005)(citing *Carpenter v. State,* 126 S.W.3d 879, 886 (Tenn.2004))).

The TFCA became effective on July 1, 2001. 2001 Tenn. Pub. Acts ch. 367. The TFCA provides that a private person may bring an action for violations involving state or a political subdivision's funds on behalf of the state or political subdivision. The person bringing such a suit on behalf of the governmental body is referred to as a *qui tam* plaintiff. In a case where the *qui tam* plaintiff has sued on behalf of a political subdivision, the political subdivision may elect to intervene. Tenn. Code Ann. § 4-18-104(c)(7)(B). In the event the state or political subdivision participates in the action, it assumes the primary responsibility for prosecuting the action but the *qui tam* plaintiff has the right to continue as a full party to the action. Tenn. Code Ann. § 4-18-104(e)(1). The Act provides the *qui tam* plaintiff the right to share in the proceeds of the action or settlement if the state or political subdivision proceeds with the action. The *qui tam* plaintiff's percentage share of the proceeds is

dependent upon the extent to which the *qui tam* plaintiff contributed to the prosecution of the action. However the *qui tam* plaintiff will receive at least twenty-five percent (25%) but not more than thirty-three percent (33%) of the proceeds of the action or settlement of the claim. Tenn. Code Ann. § 4-18-104(g)(2).

The history of the False Claims Act, 31 U.S.C. 3729 (FCA) is instructive in evaluating Knox County's claim that the Trial Court lacked jurisdiction over the *qui tam* suit. The Seventh Circuit's synopsis of the history of the FCA in *United States ex rel Mathews v. Bank of Farmington,* 166 F.3d 853 (C.A.7 1999) has often been cited by federal and state cases brought under the FCA:

> The False Claims Act was a Civil War statute, passed in 1863, originally to enable the federal government to punish and deter the fraudulent claims of war profiteers. It provided criminal and civil penalties for presenting a false claim for payment against the United States. *See* S. Rep. No. 99-345, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273. From the very first, the statute included a qui tam provision. The term comes from the Latin expression, *qui tam pro domino rege quam pro se ipso in hac parte sequitur* ("Who brings the action for the King as well as for himself"). A qui tam lawsuit is brought by a private party or "relator" who alleges fraud upon the government. If the claim is proven, the relator receives a percentage of the recovery ranging, under the current statute, from 10% to 30%. *See* 31 U.S.C. § 3730(d). The relator serves as a sort of private attorney general. The qui tam provision is based upon the idea " 'that one of the least expensive and most effective means of preventing frauds upon the Treasury is to make the perpetrators of them liable to actions by private persons acting ... under the strong stimulus of personal ill will or the hope of gain.' " *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541, n. 5, 63 S. Ct. 379, 383, 87 L. Ed. 443 (internal citations omitted).

> The statute has been amended twice, once in 1943 and more recently in 1986. The original 1863 Act allowed anyone to bring a qui tam action and receive 50% of the amount recovered. S. Rep. No. 99-345, at 10. This broad provision led to abuse and in 1943, following *Marcus*, where the Supreme Court held that a relator could bring a qui tam action based entirely upon information contained in an indictment to which he had contributed nothing, Congress amended the statute to preclude actions " 'based on evidence or information the government had when the action was brought.' " *See United States ex rel. Stinson v. Prudential Ins. Co.*, 944 F.2d 1149, 1153 (3d Cir.1991) (quoting 31 U.S.C. § 3730(b)(4) (1982) (superseded)). This led to claims being barred even in cases where the qui tam plaintiff supplied the information to the government before filing the claim. *See United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100, 1106 (7th Cir.1984).

> In 1986, Congress amended the Act again "to encourage any individual knowing of

Government fraud to bring that information forward." S. Rep. No. 99-345, at 2 U.S.Code Cong. & Admin.News 1986, pp. 5266-5267. The effect of these amendments on the whole is to broaden the qui tam provisions. Congress wanted to reward private individuals who take significant personal risks to bring wrongdoing to light, to break conspiracies of silence among employees of malfeasors, and to encourage whistleblowing and disclosure of fraud. *See id.* at 14. The legislative history shows that the 1986 amendments also, however, " 'sought to resolve the tension between ... encouraging people to come forward with information and ... preventing parasitic lawsuits.' " *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 565 (11th Cir.1994) (internal citations omitted). The provision the meaning of which is at issue in this case, § 3730(e)(4), establishes a "jurisdictional" bar against certain actions:

(e) Certain actions barred-

. . . . .

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

Congress intended that the courts not be troubled by persons who wish to capitalize on others' discovery of frauds to the exposure of which they themselves have in no way contributed. However, the jurisdictional bar is not to be excessively narrowly construed. Our basic task in statutory interpretation is "to give effect to the intent of Congress." *United States v. American Trucking Ass'ns,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345. The provision is therefore to be understood in the context of the 1986 amendments, which, as explained, broaden the qui tam provisions, increasing incentives for the exposure of fraud.

*Mathews* at 857-858.

Knox County claims that the Trial Court lacked subject jurisdiction because the

allegations in the *qui tam* complaint are based almost exclusively on information contained in public records obtained from Knox County and because the allegations had been publicly disclosed in the audit report, which precluded Environmental from participating in the action. *Citing,* Tenn. Code Ann. §4-18-104(d)(3).

> (A) No court shall have jurisdiction over an action under this chapter based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, **in an investigation, report, hearing, or audit** conducted by or at the request of the general assembly, comptroller of the treasury, or governing body of a political subdivision, **or by the news media**, unless the action is brought by the attorney general and reporter or the prosecuting attorney of a political subdivision **or the person bringing the action is an original source of the information.** (Emphasis added).

> (B) For purposes of subdivision (d)(3)(A), "original source" means an individual, who has direct and independent knowledge of the information on which the allegations are based, who voluntarily provided the information to the state or political subdivision before filing an action based on that information, and whose information provided the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in subdivision (d)(3)(A).

Tenn. Code Ann. §4-18-104(d)(3)(A) and (B).

Once the issue of public disclosure is raised, the *qui tam* plaintiff has the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *U.S. ex rel. Bly-Magee v. Premo*, 470 F.3d 914, 916 (9th Cir. 2006)(citing *United States ex rel. Harshman v. Alcan Elec. & Eng'g, Inc.,* 197 F.3d 1014, 1018 (9th Cir.1999)). Application of subsection (e)(4)(A) of the FCA and subsection (d)(3)(A) of the TFCA to *qui tam* suits involves a four-part inquiry: (1) whether the alleged public disclosure contains allegations or transactions from a listed source; (2) whether the alleged disclosure has been made public within the meaning of the Act; (3) whether the relator's complaint is based upon this public disclosure; and, if so, (4) whether the relator qualifies as an original source. *U.S. ex rel. Grynberg v. Praxair, Inc.* 389 F.3d 1038, 1048 -1049 (10th Cir. 2004), cert. den'd 125 S. Ct. 2964, 545 U.S. 1139, 162 L. Ed.2d 888 (2005). In cases where the information is found to have been publically disclosed before the *qui tam* plaintiff filed suit, jurisdiction may still be found by the *qui tam* plaintiff establishing it: (1) "possessed direct and independent knowledge of all the essential elements of the fraud allegations" and, (2) notified the government of the allegations prior to filing the FCA action. *U.S. ex rel. Hafter D.O.v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1159 (10th Cir. 1999). The question of whether a particular document triggers the public disclosure bar is a mixed question of law and fact. *U. S. v. Alcan Elec. and Engineering, Inc.*, 197 F.3d 1014, 1017 (9th Cir. 1999)(citing *United States ex rel. Lindenthal v. General Dynamics Corp.,* 61 F.3d 1402, 1409 n. 9 (9th Cir.1995). Tennessee law provides that the standard of review on mixed questions of law and fact is *de novo* with a presumption of correctness extended only to the trial court's findings of fact. *In re Estate of Hutcherson* at * 3.

The Trial Court found that the *qui tam* suit was "based upon" a public disclosure within the meaning of the statute. The evidence and case authority support this finding.

Environmental acknowledges that the majority of the Federal Circuits take the position favored by Knox County, however, it urges this Court to side with the minority view on the meaning of "based upon" adopted by the Fourth and Seventh Circuits.

The court in *U.S. ex rel. Ondis v. City of Woonsocket, R.I.,* 582 F. Supp. 2d 212 (D. R. I. 2008) recently considered the split in the circuits over the meaning of "based upon" in the context of the FCA. The court acknowledged there is a split of authority as to whether a *qui tam* action is "based upon" a "public disclosure" when the facts alleged were publicly disclosed but the *qui tam* independently obtained the information from a different source. The court noted that the majority view is that a *qui tam* complaint is "based upon" publicly disclosed information "when the supporting allegations are similar to or 'the same as those that have been publicly disclosed ... regardless of where the relator obtained his information." *U.S. ex rel. O'Keeffe v. Sverdup Corp.* 131 F. Supp.2d 87, 92 (D. Mass. 2001)(citing *United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 324 (2d Cir.1992)); *see also U.S. ex rel. Mistick PBT v. Housing Authority of City of Pittsburgh*, 186 F.3d 376, 386 (C.A.3 (Pa.)1999). The *United* Court provided the following reasoning for its application of the majority view:

> [T]o focus solely on the words "based upon" in subsection [31 U.S.C. § 3730](e)(4)(A) and narrowly interpreting those words to bar *qui tam* actions only where the relator actually derived the relevant facts alleged from public disclosures would "render the public disclosure bar's 'original source' exception superfluous." [O'Keefe] at 93. *See United States ex rel. Duxbury v. Ortho Biotech Products, L.P.,* 551 F. Supp.2d 100, 107-108 (D. Mass. 2008). The purpose of the "original source" exception is to permit *qui tam* actions that otherwise would be barred where the relator has "direct and independent" knowledge of the information on which the allegations are based. 31 U.S.C. § 3730(e)(4)(B). Applying the "public disclosure" bar only where the relator *actually* obtained the facts alleged in his complaint from the public disclosure is simply another way of saying that the bar does not apply if the relator had "independent" knowledge and, therefore, it would eliminate any need for the "original source" exception. *O'Keeffe,* 131 F.Supp.2d at 93; *Mistick,* 186 F.3d at 386-87. In effect, such an interpretation would "swallow[ ] the original source exception whole." *United States ex rel. Findley v. FPC-Boron Employees' Club,* 105 F.3d 675, 684 (D. C. Cir.1997).

*Ondis* at 218.

The reasoning of the court in *Ordis* and the majority of the circuits is consistent with

-10-

the basic rule of statutory construction that legislative intent should primarily be ascertained from the natural and ordinary meaning of the language used when read in the context of the entire statute and that all parts of the statute shall be deemed relevant and operative and where possible the courts will avoid finding any language used by the legislature to be superfluous, void or insignificant. *Mann v. Grist,* 1990 WL 120723 at * 4 (Tenn. App. Aug. 22, 1990. In the case before us, the evidence showed the facts set forth in the report on the audit mirrored the facts set forth in the *qui tam* complaint, thus, the complaint was "based upon" the report. Accordingly, the public disclosure bar found in Tenn. Code Ann. §4-18-(d)(3)(A) would prevent the Trial Court from having jurisdiction over the *qui tam* complaint unless Environmental could show that it qualified as an original source.

To be an "original source" under the TFCA, the *qui tam* plaintiff must establish that it had "direct and independent knowledge" of the information on which the allegations are based, that it voluntarily provided the information to Knox County before filing the action and that the information provided the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in Tenn. Code Ann. §4-18-(d)(3)(A). Two of the three elements necessary to prove that Environmental was an original source are undisputed. The evidence clearly demonstrated that Environmental voluntarily provided evidence of Arrow's fraudulent billing and the County's payments to Arrow and that the information regarding the fraud caused the County Commission and Law Department to order the internal audit. Thus, whether Environmental had direct and independent knowledge of the fraud becomes the issue.

In construing the term "original source," in the FCA, the federal courts have imposed a conjunctive requirement-direct and independent-on qui tam plaintiffs. *U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.* 123 F.3d 935, 941 (6th Cir. 1997); *United States ex rel. Stinson v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir.1991); *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir.1990). The word "direct" is usually interpreted as "marked by absence of intervening agency," *McKenzie* at 941 (citing *Stinson,* at 1160), while "independent knowledge" is not "dependant on public disclosure." *McKenzie* at 941. Knox County argues that because Environmental discovered Arrow's fraudulent billing practices and the overpayment by the County by researching and analyzing documents contained in the County's public records produced to Environmental in response to its document request, Environmental cannot qualify as an original source. To support this argument, the County must equate the invoices, payment records and diagrams of the schools contained in KCS's records as "publically disclosed" documents. The County also argues that Environmental had no "direct" knowledge of the transactions between Arrow and the County because Environmental was a stranger to the transaction and had no independent knowledge of Arrow's work or billing procedures. The County maintains that collateral research and investigations do not establish direct and independent knowledge of the information on which the allegations are based; nor does the fact that the relator's background knowledge enabled it to understand the significance of the information acquired make its knowledge independent, and cites *United States ex rel, Kreindler & Kreindler v. United Technology Corp.,* 985 F2d 1148, 1159 (2d. Cir. 1993).

In *Kreindler* the plaintiff relied on information that had already been publically published in a court record in another case. In this case, Environmental did not initially rely on earlier published information when it first disclosed the findings of fraud to Knox County, unless the source of Environmental's findings, Arrows invoices, the diagrams of the schools and payment records found in the County's public records can be characterized as "publically disclosed documents".

The cases relied on by the Trial Court in this case, *Springfield*, *Kennard* and *Atkinson*[1] cases stand for two propositions which the Trial Court applied: (1) The "direct and independent knowledge of information on which the allegations are based" language in § 3730(e)(4)(B) of the FCA and §4-18-104(d)(3)(B) of the TFCA refers to direct and independent knowledge of *any* essential element of the underlying fraud transaction (*Springfield*) and (2) that a *qui tam* plaintiff can be an original source under certain circumstance, even if public records have been used to establish an element of the fraud (*Kennard* and *Atkinson*). The Trial Court concluded that although Environmental relied on information from Knox County's public records to construct its claim of fraudulent billing by Arrow, Environmental still qualified as an original source because Howard's initial suspicions of the fraud were based on his personal knowledge of the relationship between Swann and Thomas and his belief that Swann preferred doing business with Arrow rather than Environmental, and concluded that Environmental was an original source of the fraud.

Knox County also relies on *United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc.* 186 F. Supp. 2d 458 (S.D.N.Y. 2002), to support its position that Environmental could not have been the original source of information that Knox County relied on when it issued its report on the audit. The difference between *Kalmanovitz* and this case is there was no evidence that Knox County had ever issued a report or initiated the making of a report that showed any information about Arrow termite contracts, much less Arrow's fraudulent billing practices prior to Environmental bringing the fraud to the County's attention. Accordingly, in *Kreindler* the *qui tam* plaintiff was not an original source because he had based his allegation of fraud on information made public in court records in an earlier case. In *Kalmanovitz* the *qui tam* plaintiff was not an original source because the facts relied on to show fraud had been published in scientific articles. Here, while the invoices, payment records and diagrams of the schools relied on by Environmental were contained in the Knox County records, there was no indication of fraud in the records until Environmental "connected the dots" and there is no evidence that Knox County would ever have discovered the evidence of the fraud if Environmental had not stepped in.

The Trial Court found that Environmental was an original source. First, Mr. Howard was first alerted to the possibility of a fraud based on his personal knowledge of the relationship between Mr. Thomas (the Arrow/Allied salesman) and Mr. Swann, who was the decision maker for

---

[1] *Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 656 (D. C. Cir.1994); *Kinnard v. Comstock Resources, Inc.,* 363 F2d 1039 (10th Cir.)(2004) and *United States ex rel. Atkinson v. PA. Shipbuilding Co.,* 473 F.3d 506 (3rd Cir. 2007).

the County on the termite contracts and on various conversations he had with Mr. Swann. Based upon this information, Mr. Howard initiated an investigation by hiring an attorney and investigator, who gathered and analyzed documents and discovered in a very short period of time the fraudulent billing practices of the defendants. In other words, Mr. Howard "connected the dots" contained in the public documents based on his suspicions of fraud that first arose because of his personal knowledge of the situation. The trial court, in concluding that Mr. Howard and Environmental were an original source stated:

> The legislature has declared that the FCA is remedial in nature and is to be liberally construed to effectuate its purpose. Tenn. Code Ann. § 4-18-107(c). Under these circumstances one would be hard pressed to describe Mr. Howard as a "parasitic plaintiff". Indeed, the unrefuted testimony is that he had no idea that he could possibly benefit from pursuing the investigation into these fraudulent activities when he commenced his efforts in December 2000. In fact, there was no such method by which he could benefit at that time. Accordingly, the Court concludes that Mr. Howard is an original source taking into consideration all the factors set forth in the cases cited above.

To the extent that the Chancellor's Judgment is based on factfinding, the evidence does not preponderate against his findings of fact. Tenn. R. App. P. 13(d).

The TFCA provides that when the when the government intervenes in a *qui tam* action brought under the Act, the *qui tam* plaintiff is entitled to receive a share of the "proceeds" of the action or settlement as follows:

> If the state or political subdivision proceeds with an action brought by a qui tam plaintiff under subsection ©, the qui tam plaintiff shall, subject to subdivisions (g)(4) and (5), receive at least twenty-five percent (25%) but not more than thirty-three percent (33%) of the proceeds of the action or settlement of the claim, depending upon the extent to which the qui tam plaintiff substantially contributed to the prosecution of the action.

Tenn. Code Ann. § 4-18-104(g)(2).

Knox County and Arrow entered into a settlement agreement whereby Arrow installed a total of 194,907 linear feet of the Sentricon system in the Knox County Schools and the parties stipulated that $2.85 per linear foot was "reasonably representative" of the market value of the installation of system. However, the County and Environmental disputed whether the provisions of Tenn. Code Ann. § 4-18-104(g)(2) applied to the Sentricon installation furnished by Arrow to the County under the terms of the settlement. Environmental filed a motion for summary judgment on the

issue and the Trial Court held that the installation of the Sentricon system pursuant to the settlement agreement constituted "proceeds" of the settlement within the meaning of the Act and that Environmental was entitled to recover a share of the value of the proceeds. The Trial Court then ordered that an evidentiary hearing be held to determine the value of the proceeds of the settlement.

The TFCA does not provide a definition for "proceeds" as used in section 4-18-104(g)(2) nor does the FCA provide a definition for the term "proceeds" as used in 31 U.S.C. § 3730(d)(1).[2] The County argues, based on dictionary definitions of the word "proceeds" that Knox County did not receive money or any property, tangible or intangible, that could be converted into money, and there are no "proceeds" of the settlement to be divided with Environmental as its share of the settlement. However, when construing the term "proceeds" of a settlement under the FCA, federal courts have specifically held that the term embraces a number of things in addition to money or property. *See* Clair M. Sylvia, The False Claims Act: Fraud Against the Government, Part III. Damages, Penalties and Other Remedies, § 8:21, FCAG § 8:21 (citing *U. S. v. U. S. ex rel. Thornton*, 207 F.3d 769 (5th Cir. 2000) and *U.S. ex rel. Barajas v. U.S.*, 258 F.3d 1004 (9th Cir. 2001)).

*Barajas* and *Thornton* held that non-monetary things of value can be considered proceeds of a settlement under the FCA, and we conclude the Trial Court did not err when it considered the installation of the Sentricon system by Arrow in the Knox County schools the proceeds of settlement between the County and Arrow.

Environmental appeals the Trial Court's valuation of the settlement at $255, 523.07 and contends the Trial Court should have evaluated the settlement at $555,484.95 based on the parties' stipulation that pursuant to the settlement agreement Arrow installed 194,907 linear feet of the Sentricon system in the Knox County Schools and that a reasonable cost for the treatment was $2.85 per linear foot.[3] Knox County does not appeal the trial court's valuation of the settlement and states in its brief: "Knox County submits . . . that the trial court's determination regarding the value of the settlement should be affirmed because it was within both the evidence and the applicable law."

In placing a value on the installation of the Sentricon system in the Knox County schools by Arrow pursuant to the settlement, the Trial Court relied on the parties' stipulation that Arrow installed 194,907 linear feet of the Sentricon system and that a reasonable cost for this service

---

[2] 31 U.S.C.A. § 3730 (d)(1) provides for an award to a qui tam plaintiff in the event the government settles a qui tam suit: "If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent **of the proceeds of the action or settlement of the claim**, depending upon the extent to which the person substantially contributed to the prosecution of the action."

[3] $2.85 \times 194,907 = 555,484.95$.

was $2.85 per linear foot, which would result in a total value for the installation of $555,484.95. However, the Trial Court found that the audit conducted by Knox County showed that either Arrow or Allied had installed the Sentricon system in 46% of the schools (39 schools) prior to the settlement.[4] Based on the finding that 46% of the schools had been treated before the settlement, the Court decided the value of services Arrow delivered to the County pursuant to the settlement was $255,523.07, which is 46% of $555,484.95. The Court stated this finding as follows: "Therefore, giving the County every benefit as to whether or not it is receiving any value for the balance of the services, it appears, at the least, it is receiving services with a value to the [C]ounty of $255,523.07."

We conclude the valuation of the settlement based on 46% of $555,484.95 is flawed if the County had already received and paid Arrow and or Allied for installation of the system in 46% of the schools pre-settlement because those services would have nothing to do with the settlement. In fact, the installation of the Sentricon system in 46% of the schools was part of the fraudulent over billing scheme that forms the basis of this action and for which the settlement was designed to remedy. Under the Trial Court's reasoning, the settlement value should be $299, 961.87, which is 54% of 555,484.95 because 54% of the schools had the Sentricon system installed after the settlement.

However, another issue arises based on the Trial Court's finding that 46% of the schools had the system installed before the settlement. The proof was that all eighty-four Knox County schools were treated under the settlement agreement and that the linear footage for treatment of all of the schools was 194,907 linear feet. There was evidence that all eighty-four schools had been treated with the Sentricon system after the settlement and no one testified regarding whether it was necessary to retreat the thirty-nine schools (46%) that already had the Sentricon installed prior to the settlement or whether the County benefitted from the reinstallation of the systems in those schools.

If the installation of the Sentricon systems in those thirty-nine schools after the settlement was superfluous, then the County did not receive any real value from the service and it should not be counted as part of the value of the settlement. As there is no evidence in the record regarding why the Sentricon system was installed in 46% of the schools where the system was already in place pre-settlement, we remand the case for the Trial Court to hear additional evidence on the issue pursuant to Tenn. Code Ann § 27-3-128.[5] *See State ex rel. Vaughn v. Kaatrude*, 21 S. W. 3d 244

---

[4] In fact, during the evidentiary hearing the parties stipulated that thirty-three of the schools were treated with Sentricon prior to the settlement based on the findings of the audit. The audit report actually reports that thirty-nine schools were treated before the settlement, as the trial court found.

[5] Tenn. Code Ann. § 27-3-128 provides that "[t]he court shall also, in all cases, where, in its opinion, complete justice cannot be had by reason of some defect in the record, want of proper parties, or oversight without culpable negligence, remand the cause to the court below for further proceedings, with proper directions to effectuate the objects of the order, and upon such terms as

(Tenn. Ct. App. 2000).

Environmental also disputes the Trial Court's award of 28% of the proceeds of the settlement to it and argues that it should have been assigned the maximum percentage allowed by law. The TFCA provides that a *qui tam* plaintiff is entitled to at least 25% but not more than 33% of the proceeds of the action or settlement of the claiming, depending upon "the extent to which the *qui tam* plaintiff substantially contributed to the prosecution of the action." Tenn. Code Ann. § 4-18-104(g)(2). According to the case law developed under the FCA, the actual percentage awarded to the *qui tam* plaintiff is within the trial court's discretion. *See United States ex rel. Merena v. Smithkline Beecham Corp.,* 52 F. Supp.2d 420, 449 (E. D. Pa.1998). We found no Tennessee case addressing the determination of the *qui tam* plaintiff's percentage share of the proceeds of the action or settlement, and we look to case law developed under the FCA for guidance. The Court in *U.S. ex rel. Johnson Pochardt v. Rapid City Regional Hosp*. 252 F. Supp.2d 892, 897 (D. S. D., 2003) relied on what is referred to as "The Senate Factors" in FCA cases when examining the contributions made by the *qui tam* plaintiff. The Court explained that when passing the 1986 amendments to the False Claims Act, the Senate discussed factors to consider in determining the relator's share including: (1) the significance of the information provided by the relator, (2) the relator's contribution to the final outcome, and (3) whether the government previously knew such information. *Johnson Pochardt* at 897 (citing *Quorum Health* at 1332 (quoting S. Rep. No. 99-345 at 28 (1986))).

The first factor, a contribution of significant information, encompasses the development of factual information, documentary evidence, and legal arguments. *Quorum Health,* 171 F. Supp.2d at 1332. In this case, Environmental developed the factual information and documentary evidence through the efforts of Mr. McGehee and Mr. Howard to demonstrated to the County that Arrow and Allied were engaged in fraudulent billing practices. As far as development of a legal theory, it was Environmental and not the County who filed the action under the TFCA. The provisions in the TFCA for treble damages, civil penalties and attorney's fees undoubtedly provided an incentive for settlement that may have been lacking if the County had proceeded alone with its suit for compensatory damages. Environmental's contribution of significant information to the case was substantial.

The efforts of Mr. McGehee and Mr. Howard in getting the attention of various County officials and employees focused on the evidence of the fraud contributed to County's decision to conduct an audit and the findings of the audit resulted in the filing of the County's suit. Environmental's filing of its suit under the TFCA once the audit report was made public was the impetus for the County to file its suit for damages, and the filing of the TFCA suit by Environmental impacted the result of the action. Environmental was present at several settlement conferences, but the final settlement was entered into out of the presence of Environmental. However, Environment's claim that its action, with its treble damages, attorney's fees and civil penalties provisions contributed to the defendants' interest in settling.

---

may be deemed right."

As to the third Senate Factor, the Trial Court concluded that "[t]he overwhelming proof in this case indicates that the over billing would never have been discovered without the *qui tam* plaintiff's pre-litigation investigation and report to the government. Indeed, it is highly likely that the practice would continue to the present resulting in additional losses to the County." The Trial Court's assessment on the issue of whether the government previously knew of the information was correct. The evidence shows the County did not know of the fraudulent over billing and probably never would have without Environmental's intervention.

Although this Court, based on the Senate Factor analysis, may have been inclined to award a higher percentage of recovery to Environmental than the Trial Court did, we cannot say that the Trial Court abused its discretion when it awarded the *qui tam* plaintiff 28% of the proceeds of the settlement. It is well established that under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." The abuse of discretion standard does not permit this Court to substitute its judgment for that of the Trial Judge. *Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn.2001).

Environmental objected to the standard of proof employed by the Trial Court in determining the value of the proceeds of the settlement based on the Trial Court's statement in its Memorandum Opinion that "it would appear that giving the County every benefit of the doubt that the Sentricon system was of value to the County in a least 39 different locations or roughly 46% of the school facilities." Environmental argues that based on the "every benefit of the doubt" language the Trial Court used an erroneous standard of proof and should have assigned the burden of proof on the valuation of the proceeds to Knox County by a preponderance of the evidence.

The federal case law under the FCA provides very little guidance regarding the standard or proof for determining the value of non-monetary proceeds and the only case located is *U.S. v. U.S. ex rel. Thornton,* 207 F.3d 769 (5th Cir. 2000), which was also cited by the County. In *Thornton*, the court explained that the government should provide the court with an estimate of the value of the non-monetary proceeds, but ultimately, the *qui tam* plaintiff bears the burden of disproving the government's estimate of value. *Thornton* at 772.

From reviewing this record, we cannot discern whether the Trial Court placed the burden of proof on the County or Environmental regarding the valuation of the settlement, and additionally, we cannot ascertain if the "benefit of the doubt" language of the Trial Court was just an unfortunate turn of phrase with no significant meaning or whether it was an indication that the Trial Court was applying a standard of proof below or beyond the preponderance of the evidence standard. Accordingly, this is another ground to remand the case, and the Trial Court should keep in mind that the *qui tam* plaintiff has the ultimate burden to prove the value of the settlement proceeds by a preponderance of the evidence.

In sum, we hold the Trial Court was correct when it held the *qui tam* plaintiff was an original source and held that the Court had subject matter jurisdiction over the suit brought under the Tennessee Fair Claims Act, Tenn. Code. Ann. §4-18-101 *et seq.*

The Trial Court was correct when it held that the installation of the Sentricon system at the Knox County schools was the proceeds of the settlement between Knox County and Arrow and was subject to the *qui tam* plaintiff's statutory share of the proceeds of the settlement.

The evidence does not support the Trial Court's valuation of the proceeds of the settlement, which forms the basis for remand for determining the value, after hearing further evidence as to the actual value of the proceeds of the settlement. Specifically, evidence should be submitted on whether there was a need for installation of the Sentricon system post-settlement at the 46 % of the Knox County schools that already had the system installed and the extent the County benefitted from any of those services.

Further, the Trial Court did not abuse its discretion when it assigned the *qui tam* plaintiff's statutory percentage as 28% of the settlement value. The cause is remanded for further proceedings consistent with this Opinion, with the cost of the appeal assessed one-half to Knox County and one-half to Environmental Termite & Pest Control, Inc.

_____
HERSCHEL PICKENS FRANKS, P.J.

-18-